State v. Hector Leonel Gutierrez & Edgar Perez-Lazaro, No. 86, Sept. Term 2014, Opinion by Battaglia, J.

CRIMINAL LAW – POSSESSION OF A CONTROLLED DANGEROUS SUBSTANCE WITH AN INTENT TO DISTRIBUTE – POSSESSION OF A FIREARM WITH A NEXUS TO A DRUG TRAFFICKING CRIME – SUFFICIENCY OF THE EVIDENCE

Evidence of joint constructive possession of a gun and cocaine was sufficient to support convictions, when the gun and cocaine were secreted in the common areas of an apartment, the respondents stated they lived in the apartment, their personal papers were found in the apartment and drug paraphernalia was in plain view.

Circuit Court for Prince George's
County, Maryland
Case No. CT 12-1276A  CT 12-1276B
Argued: November 9, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 86
September Term, 2014

STATE OF MARYLAND

v.

HECTOR LEONEL GUTIERREZ &
EDGAR PEREZ-LAZARO

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T.
(Retired, Specially
Assigned),

JJ.

Opinion by Battaglia, J.
Greene, Adkins and McDonald, JJ.,
dissent.

Filed: January 28, 2016

At approximately seven in the evening on August 9, 2012, Prince George's County Police executed a search warrant at apartment 102 located at 8018 14th Avenue in Hyattsville. The apartment was small and compact and contained a single bath, a galley-style kitchen and one bedroom, although the living room contained at least one other bed. When police entered the apartment, they encountered the Respondents, Hector Gutierrez and Edgar Perez-Lazaro.

Detective Jason Swope, of the Prince George's Police Department, the lead investigator for the search, initially found baggies, about which he later testified are commonly used for packaging drugs, in plain view on a table in the living room. With the assistance of a translator, Gutierrez and Perez-Lazaro contemporaneously were read and waived their Miranda rights; Gutierrez stated that he slept in the living room, while Perez-Lazaro replied that he slept in the back bedroom.

During the search, Sergeant James Dyson, also of the Prince George's Police Department, discovered individually wrapped bags of a white powdery substance, later identified at trial as cocaine hydrochloride, stacked together in the front of the bathroom cabinet, visible immediately upon its opening. Detective Jeffrey Konya, yet another officer of the Prince George's Police Department, searched a hallway closet and discovered baggies of a white powdery substance wrapped in foil, later identified as cocaine hydrochloride, as well as two passports and a receipt with Gutierrez's name, on a shelf.[1] A "grinder" was found on the kitchen windowsill which, at trial, was testified to

---

[1] No further identifying information is in the record with regard to the documents found.

by Officer Natalia Gaston, who had been qualified as an expert in the field of distribution and packaging of CDS, as a device that "breaks [cocaine] down, it breaks down the crystal part of it so it can get it to more of a powder." Various other plastic baggies were also found on the kitchen windowsill.

Another ten baggies of white powdery substance, identified later as cocaine hydrochloride, as well as a loaded black Smith and Wesson 9MM semiautomatic handgun with no serial number, were also recovered from under the kitchen sink and were visible upon opening the cabinet. A paystub belonging to Perez-Lazaro and dated May 18, 2012, was recovered from the back bedroom, although no further identification of its contents is in the record.

Both Gutierrez and Perez-Lazaro were indicted for possession[2] not only of a controlled dangerous substance,[3] but also with intent to distribute a controlled dangerous substance,[4] as well as possession of a firearm with a nexus to drug trafficking[5] in addition to obliteration of the identification number of a firearm.[6]

---

[2] Pursuant to Section 5-101(v) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol., 2013 Cum. Supp.) "'Possess' means to exercise actual or constructive dominion or control over a thing by one or more persons."

[3] Section 5-601(a) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:
>  (a) Except as otherwise provided in this title, a person may not:
>  (1) possess or administer to another a controlled dangerous substance, unless obtained directly or by prescription or order from an authorized provider acting in the course of professional practice[.]

[4] Section 5-602 of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:

(continued . . . )

Trial was held in February of 2013 in the Circuit Court for Prince George's County, before Judge Hassan A. El-Amin. Both Gutierrez and Perez-Lazaro moved for judgment of acquittal. Gutierrez argued that the evidence did not sufficiently connect him to the drugs or the gun:

> The only evidence that's been offered in this case is that Mr. Gutierrez made a statement to the police that he slept in the living room of the apartment and then there was two passports and a piece of paper found in the closet that identified Mr. Gutierrez. . . . [T]here was no other evidence specifically connecting Mr. Gutierrez to the drugs, there was no other evidence specifically connecting Mr. Gutierrez to the gun that was found.

Perez-Lazaro similarly argued that, "the only thing [the State] ha[s] is that [Perez-Lazaro] was present at the time, and he admitted to sleeping in the back room and actually found

( . . . continued)
> Except as otherwise provided in this title, a person may not:
> (1) distribute or dispense a controlled dangerous substance; or (2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance.

[5] Section 5-621(b) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:
> (b) During and in relation to a drug trafficking crime, a person may not:
> (1) possess a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime.

[6] Section 5-142 of the Public Safety Article, Maryland Code (2003, 2011 Repl. Vol.) states:
> (a) A person may not obliterate, remove, change, or alter the manufacturer's identification mark or number on a firearm.
> (b) If on trial for a violation of this section possession of the firearm by the defendant is established, the defendant is presumed to have obliterated, removed, changed, or altered the manufacturer's identification mark or number on the firearm.

a pay stub." Both motions were denied with respect to all four counts. During closing

argument, Gutierrez's counsel asserted that the State had failed to show that he had

possession of the cocaine because there were multiple people in the apartment:

> What evidence do we have that actually shows how many people were living in this apartment? Because the police didn't want to bother. They figured we got two people inside, we're just going to charge them and move on from there.
> Is it realistic to believe that what was found in this apartment was just communal cocaine, that this was somehow some sort of hippy commune of drug dealers that are all just sharing drugs and guns and everything that's found inside the residence?

Perez-Lazaro's counsel also pointed to the possibility of more people in the apartment:

> Now, there are other beds, but he was there. One of the officers said there were three people, two or three. But they were the ones that were brought in. We know that more than two people were there. You have a couch, two beds in the living room. We don't even know how many beds in the bedroom.
> But there are issues here. Just at a minimum it would be nice to at least know who, what, where, when, why, and, of course, photos of the room, because then we wouldn't have to rely on if he works, how many beds were in each room, who lived where, where things were situated.

> Perez-Lazaro's counsel also argued in closing that the State needed more evidence

such as fingerprint analysis or a DNA expert:

> But they still need more than just being present. . . . Imagine if we would have heard from a fingerprint expert that compared the fingerprints on the grinder to my client and said, yeah, they matched, or there was a DNA expert who says the same thing about baggies that were found under the sink, the gun that was found in the kitchen matched the DNA of my client to a certain person? What can I say to that? What can I stand here now and say, since I wasn't present? You've got to ask yourself why not. That would have locked this thing up, that would have shut me down. I wouldn't have had anything to say, you all would be home.
> * * *
> I know the science person could have at least shown us good faith that they're trying to exonerate certain people and check who the DNA's was,

4

and then at least then we feel they were trying to exclude, to find out who was really the problem, really had the matter proceeded to trial to really put the evidence there. But they didn't. And that's a problem. You know, I'm really glad that we don't have to do the same things as the jurors in the l960's and 1970's. If you read the paper at least once a week, once a month you'll see somebody who is found guilty on words is able to prove their innocence because of science and technology.

And see, that should be like ash in your mouth to know that somebody has to prove their innocence. See, that's not the burden. But back then they didn't have those advantages. We've got them now. We should use them now. And if we don't use them, you should ask why.

During the State's rebuttal closing argument, the State's Attorney responded that fingerprinting and DNA analysis were not "routine," that Defense counsel "has the same subpoena power as the State" and that drugs never come "with the defendant's name on it":

[STATE'S ATTORNEY]: The detectives go in to their place, and I don't have a cameraman working like in the cases that you hear on TV, where they just do fingerprints and DNA routinely, constantly. That's not the way it is. They don't do routine fingerprints, they don't do routine DNA. This is a drug case. The State has budget concerns. This is a drug case where we have homicides that get DNA, homicides get fingerprints, and even in the homicide case might not get fingerprints or DNA. We have technology and science at our availability; but is it within our cost? Not always.

\* \* \*

If you are in an apartment and there [are] little bags out or a grinder and you don't know what it is, why is it in your apartment? Both defense counsel testified -- excuse me. Both defense counsel told you in their opening that that apartment belonged to several people.

And they want to testify as to the State didn't find out who those several other people are. Defense counsel has the same subpoena power as the State. No other people here, we didn't hear from any other people. Defense wants to cloud your opinion and state that there are other people but they only arrested two, there must be some more people out there. There are no more people out there. It's the two defendants that were found at the residence that night.

\* \* \*

Don't be dissuaded by defense counsel telling you they don't have any evidence all they have is words. We have evidence. You have the evidence

5

to take back with you in the jury room. You have any corroboration of the evidence that they found. No one in the few drug cases I've had, no cop has ever found drugs and the drugs come with the defendant's name on it. There is no way any case we're going to have.

[DEFENSE COUNSEL]: Objection, Your Honor.

[THE COURT]: It is closing argument.

[DEFENSE COUNSEL]: I understand, Your Honor.

[THE COURT]: And I believe you talked about your experience.

[DEFENSE COUNSEL]: No problem, Your Honor. Yes, Your Honor.

[THE COURT]: Objection is overruled, but, Counsel, please keep it close to what's in evidence.

[STATE'S ATTORNEY]: Your Honor, thank you. I apologize.

The jury returned a verdict of guilty on all four counts with respect to both Gutierrez and Perez-Lazaro. Gutierrez was given concurrent sentences with a total time to be served of seven years, five of which were without parole, followed by five years' probation. Perez-Lazaro also received concurrent sentences for a total sentence to be served of five years, followed by five years' probation.[7]

The Court of Special Appeals, in an unreported opinion, reversed. Our intermediate appellate court concluded that the State not only failed to prove that Gutierrez or Perez-Lazaro had possession of the cocaine and handgun, because they were not found in "close proximity" to the contraband, but did not prove "ownership of the apartment" and that the contraband was not out in the open.

---

[7] In the Court of Special Appeals, Perez-Lazaro argued that the trial court erred in failing to merge his simple possession conviction with his possession with intent to distribute conviction. The Court of Special Appeals did not address this argument. The issue was not raised before us. The issue, however, does not have to be addressed because the trial court merged the two; the court noted that "Count I [possession of cocaine] is going to merge with Count II [possession with intent to distribute cocaine]" and the docket entries and commitment order reflect merger.

6

The intermediate appellate court also examined, in a lengthy footnote, the prosecutor's comments in closing argument and opined that, "[i]t was improper for the prosecutor to argue facts not in evidence" when the prosecutor stated, "No one in the few drug cases that I've had no cop has ever found drugs and the drugs come with the defendant's name on it. There is no way any case we're going to have [that]. . . ." Furthermore, the court reasoned that the closing argument improperly "shift[ed] the burden to the defense to present a case" and improperly questioned "why the defense counsel failed to call witnesses" because the prosecutor commented that "Defense counsel has the same subpoena power as the State."

We are called upon by the State to grapple with the same areas of inquiry.[8] We address whether two persons may be found guilty of possession of a controlled dangerous substance ("CDS") with an intent to distribute and possession of a handgun in relation to a drug trafficking crime in violation of Sections 5-602[9] and 5-621[10] of the Criminal Law

_____

[8] The questions in the Petition for Certiorari are:
1. Did the Court of Special Appeals usurp the role of the jury by viewing the contested facts in the light most favorable to the defendants and by accepting, nearly verbatim, Gutierrez and Perez-Lazaro's statement of facts?
2. Under *Smith v. State*, 415 Md. 174 (2010), can a rational jury infer that two roommates had joint constructive possession of cocaine found in common areas of a one-bedroom, one-bathroom apartment?
3. Did the Court of Special Appeals err in finding that the State's rebuttal argument was improper?

[9] Section 5-602 of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:
    Except as otherwise provided in this title, a person may not:
    (1) distribute or dispense a controlled dangerous substance; or (2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under
(continued . . .)

7

Article, Maryland Code (2002, 2012 Repl. Vol.) when neither actually had the gun or drugs in hand, but each was allegedly in constructive possession of the gun and cocaine. We are asked also to determine whether the Court of Special Appeals erred in finding that the State's closing argument was improper in this case.

Essentially, we initially are called upon to review the sufficiency of the evidence adduced at trial to establish whether Gutierrez and Perez-Lazaro had joint constructive possession of the drugs and handgun. In reviewing the sufficiency of the evidence we are mindful that "[t]he standard of review for appellate review of evidentiary sufficiency is whether any rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt." *Moye v. State*, 369 Md. 2, 12, 796 A.2d 821, 827 (2002).

The State argues that the evidence was sufficient to establish possession because "a jury could conclude that Gutierrez and Perez-Lazaro had a possessory interest in the apartment, that drug paraphernalia was in plain view, and that Gutierrez and Perez-Lazaro were engaged in the mutual use of the cocaine as drug distribution activity was occurring in the apartment."

---

( . . . continued)
       all circumstances an intent to distribute or dispense a controlled dangerous substance.

[10] Section 5-621(b) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:
       (b) During and in relation to a drug trafficking crime, a person may not:
       (1) possess a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime[.]

8

Gutierrez and Perez-Lazaro, conversely, argue[11] that the evidence was legally insufficient to establish their possession of the gun and cocaine. They argue that the State failed to show that they had a "possessory interest" in the apartment and the State "failed to prove ownership of the apartment." Gutierrez argues that, "[t]he State's evidence at trial leaves it entirely unclear whether Respondent Gutierrez was a temporary visitor at the apartment, an overnight guest, or whether he was actually living at the address." Perez-Lazaro argues that, in order to establish possession, "the State must present evidence that a defendant had more of an interest in the property than sleeping or staying there temporarily unless the illegal items are found in the area where the defendant was sleeping." They state that neither was in "close proximity" to the illegal items because neither was in the rooms where the items were found. They further argue that the drugs and gun "were not in plain view and required a search to uncover" and that "[t]o prove constructive possession, the State must show that the illegal items were in plain view." They contend that "to the extent that the grinder and plastic baggies were in plain view, those intrinsically innocuous items do not add to this Court's constructive possession analysis." Additionally, they argue that there was no evidence that they participated in the "mutual use and enjoyment" of the drugs and the gun because the drugs were secreted, no evidence indicated they used drugs and the "evidence fails to establish who may have

---

[11] Gutierrez and Perez-Lazaro filed separate briefs, but each adopted by reference the other's brief pursuant to Rule 8-503(f): "In a case involving more than one appellant or appellee, any appellant or appellee may adopt by reference any part of the brief of another."

9

been using it, when the use took place, and whether any distribution of the cocaine ever occurred."

Gutierrez and Perez-Lazaro were convicted of possession of cocaine hydrochloride with an intent to distribute and possession of a firearm with a nexus to a drug trafficking crime in violation of Sections 5-602[12] and 5-621[13] of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.), among other crimes.[14] "Possess," as used in these sections, is defined in Section 5-101(v) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol., 2013 Cum. Supp.) as "to exercise actual or constructive dominion or control over a thing by one or more persons." In *Moye v. State*, we explained that, "the 'evidence must show directly or support a rational inference that the accused did in fact exercise some dominion or control over the prohibited . . . drug in

---

[12] Section 5-602 of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:

> Except as otherwise provided in this title, a person may not:
> (1) distribute or dispense a controlled dangerous substance; or (2) possess a controlled dangerous substance in sufficient quantity reasonably to indicate under all circumstances an intent to distribute or dispense a controlled dangerous substance.

[13] Section 5-621(b) of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) states:

> (b) During and in relation to a drug trafficking crime, a person may not:
> (1) possess a firearm under sufficient circumstances to constitute a nexus to the drug trafficking crime[.]

[14] Gutierrez and Perez-Lazaro were also convicted of simple possession under Section 5-601 of the Criminal Law Article, Maryland Code (2002, 2012 Repl. Vol.) and obliteration of the identification number on a firearm under Section 5-142 of the Public Safety Article, Maryland Code (2003, 2011 Repl. Vol.).

the sense contemplated by the statute, *i.e.,* that the accused exercised some restraining or direct influence over it.'" 369 Md. at 13, 796 A.2d at 828.

Since *Moye*, we have articulated four factors as pertinent to the issue of whether evidence is sufficient to support a finding of possession:

> [W]e have found several factors to be relevant in the determination of whether an individual was in possession of the CDS, including, [1] the defendant's proximity to the drugs, [2] whether the drugs were in plain view of and/or accessible to the defendant, [3] whether there was indicia of mutual use and enjoyment of the drugs, and [4] whether the defendant has an ownership or possessory interest in the location where the police discovered the drugs. None of these factors are, in and of themselves, conclusive evidence of possession.

*Smith v. State*, 415 Md. 174, 198, 999 A.2d 986, 999-1000 (2010) (internal citations omitted). Possession may be established by actual or constructive control and "the mere fact that the contraband is not found on the defendant's person does not necessarily preclude an inference by the trier of fact that the defendant had possession of the contraband." *Id.* at 187, 999 A.2d at 993.[15]

In *Moye*, we held that the evidence presented at trial was insufficient to sustain Moye's conviction based upon a constructive possession theory. In the case, the police arrived at the home of Moye's sister, Yolanda Bullock, and her husband, Joseph Bullock, after receiving a call that a battery had occurred. When the police arrived, all of the occupants of the residence were present, including Moye, who may have been staying in the home. The Bullocks and another occupant of the home, Gregory Benson, who rented

---

[15] In *Moye* we also recognized that "[t]he State [does] not need to show that [the accused] exercised sole possession of the drugs . . . the possession may be either exclusive or joint in nature." 369 Md. at 14, 796 A.2d at 828.

11

the basement of the house, came out of the residence. The police set up a barricade around the home. Through the windows, the police observed Moye moving about the first floor and the basement of the home. Several minutes later, Moye exited the home from a back door leading out of the basement. The police arrested him and subsequently conducted a search of the home, including the basement where they found several open and partially opened drawers containing several small baggies of marijuana, cocaine and drug paraphernalia.

We reversed Moye's conviction and concluded that, "we are left with nothing but speculation as to Moye's knowledge or exercise of dominion or control over the drugs and paraphernalia found in the Bullocks's basement." *Id.* at 17, 796 A.2d at 830. We reasoned that, the testimony at trial revealed that the Bullocks leased the house, rented out the basement solely to Greg Benson and, while Moye was possibly "living" in the house with the Bullocks, even if he did live in the house, he lived upstairs, not in the basement. We also noted that there was no testimony "as to any belongings, residency papers, or any other evidence which could establish that Petitioner resided at the home." *Id.* at 5 n.2, 796 A.2d at 823 n.2. We opined that the "State offered no evidence to suggest any relationship between Benson and Moye which would have established that Moye frequented the basement of the Bullocks's home or that he was aware of what items were stored in the drawers of the counter area." *Id.* at 20, 796 A.2d at 832. We also placed significance on the absence of anything in the record establishing "where Moye was located in the basement in relation to the substances in question and the duration of his sojourn." *Id.* at 18, 796 A.2d at 830-31.

12

Our analysis in *Moye* relied on *Taylor v. State*, 346 Md. 452, 697 A.2d 462 (1997), in which we reversed Taylor's conviction for possession of marijuana and paraphernalia because they were found in carrying cases belonging to another individual. In *Taylor*, police officers responded to a complaint about a possible controlled dangerous substances use violation at an Ocean City motel room occupied by Taylor and several other individuals. When police arrived, one of the other occupants admitted the officers to the motel room. When the officers entered the room, Taylor was lying on the floor, either asleep or pretending to be asleep. One of the other occupants of the room took a baggie of marijuana out of his own carrying bag and informed the officers that it was his marijuana, as well as directing the officers to another of his bags which also contained a baggie of marijuana. Although the officer testified that he smelled a strong odor of marijuana in the room, he did not observe anyone smoking it, no marijuana was visible upon entry into the room, and the ashtrays were all clean. We reversed Taylor's conviction for possession of marijuana and concluded that, "Taylor's presence in a room in which marijuana had been smoked, and his awareness that marijuana had been smoked, cannot permit a rational trier of fact to infer that Taylor exercised a restraining or directing influence over marijuana that was concealed in personal carrying bags of another occupant of the room." *Id.* at 463, 697 A.2d at 468.

Subsequent to our decision in *Taylor* and *Moye*, we had another occasion in *Smith*, 415 Md. at 174, 999 A.2d at 986, to determine whether the evidence was sufficient to establish possession of CDS. We concluded that the evidence was sufficient to establish possession when Smith was found sitting within arm's reach of a lit marijuana blunt,

13

along with four other individuals situated similarly around the table. We held that the evidence "was sufficient to find, beyond a reasonable doubt, that he was in possession of the blunt," even though no CDS or paraphernalia was found on Smith's person. *Id.* at 199, 999 A.2d at 1000. We reasoned that "[a]lthough there was no direct evidence linking physically Petitioner to the marijuana, the jury was permitted to make inferences based upon the circumstantial evidence presented at trial" and could conclude that Smith was in possession of the lit marijuana blunt within arm's reach. *Id.* at 188, 999 A.2d at 994.

In the present case, utilizing the standard of review for sufficiency, informed by our analyses in *Moye* and *Taylor* and the four factors suggested in *Smith*, we conclude that a rational trier of fact could have concluded beyond a reasonable doubt that Gutierrez and Perez-Lazaro had joint constructive possession of the cocaine and handgun found in the apartment.

Gutierrez and Perez-Lazaro had a possessory interest in the apartment, such that they had the ability and intent to exercise dominion and control. Detective Swope testified that both Gutierrez and Perez-Lazaro stated that they slept in the apartment. Personal papers belonging to both of them also were found in the apartment; Gutierrez's passports and receipt were found in the same hallway closet where some of the cocaine was located, while a paystub with Perez-Lazaro's name on it was found in the bedroom, where he stated he slept.

Unlike *Moye* in which the drugs had been found in an area of the house in which Moye did not have dominion and control, the cocaine and gun in the present case were found in areas of common use, more specifically the kitchen where the cocaine and gun

14

were found and the bathroom, where additional cocaine was located. Certainly, one can infer that the kitchen and bathroom were areas of the apartment that would be frequented by the apartment's inhabitants. *Cf. Gee v. State*, 810 N.E.2d 338, 344 (Ind. 2004) ("Unlike a kitchen, which in many households serves as a gathering place for social and familial interaction, a laundry room is usually frequented only by whomever has the task of washing clothes. . . . [N]othing in human experience tells us that anyone in particular, as a matter of course, is in and out of laundry room cabinets.").

Gutierrez and Perez-Lazaro also were in close proximity to the drugs. Unlike in *Moye* in which the house had a number of floors with the suggestion that Moye lived on the top floor while the drugs were in the basement, the small size of the apartment and the location of the drugs in the hallway, bathroom and kitchen rendered the drugs and gun available to both Gutierrez and Perez-Lazaro. *Cf. State v. Leach*, 296 Md. 591, 463 A.2d 872 (1983) (holding the evidence of possession is insufficient against one person where drugs only were found in a bedroom of another person and there is no proof of drugs in common areas of the apartment).

With respect to the concept of "mutual use and enjoyment," not only is actual use contemplated but also whether individuals participated in drug distribution. *See Cook v. State*, 84 Md. App. 122, 135, 578 A.2d 283, 289 (1990), *cert. denied*, 321 Md. 502, 583 A.2d 276 (1991) (mutual use and enjoyment could be inferred when evidence indicated that "the house was being used as a base for a drug operation in which the appellants played a role" and that "[t]herefore, despite the lack of proof that appellants had a proprietary or possessory interest in the house, the evidence was sufficient to permit the

15

jury to conclude that appellants exercised joint and constructive possession of the cocaine"). Although Gutierrez and Perez-Lazaro argue that mutual use is not proven, certainly business-wise drug dealers know to "never get high on your own supply." The Notorious B.I.G., *Ten Crack Commandments*, on Life After Death (Bad Boy Records 1997) (stating that rule "Number 4: I know you heard this before / Never get high on your own supply").

The Court of Special Appeals reached the opposite conclusion. Our intermediate appellate court, as does Gutierrez and Perez-Lazaro before us, however, relied on *Garrison v. State*, 272 Md. 123, 321 A.2d 767 (1974) and *Leach*, 296 Md. at 591, 463 A.2d at 872, both of which are distinguishable. In *Garrison*, police entered Garrison's house pursuant to a search warrant and found Garrison sleeping in a bedroom while her husband was attempting to discard baggies of heroin in a bathroom adjacent to a separate bedroom; no heroin or drug paraphernalia was found in the bedroom in which Garrison was found although Garrison was subsequently convicted of possession of heroin. We reversed stating that, "[t]he seized heroin was not in the plain view of the appellant, nor was there a juxtaposition between her (in the front bedroom) and the contraband being jettisoned by her husband in the bathroom." 272 Md. at 131, 321 A.2d at 771. We concluded that, "there was no substantive evidence offered which showed directly or supported a rational inference that she had 'the exercise of (either) actual or constructive dominion or control'—solely or jointly with her husband—over the 173 glassine bags of heroin seized while being discarded by her spouse." *Id.* at 142, 321 A.2d at 777. In the instant case, however, the drugs were found in common areas of the kitchen and the

16

bathroom of a small apartment in which Gutierrez and Perez-Lazaro lived. The drugs, handgun and paraphernalia allowed for an inference of both knowledge and dominion and control.

In *Leach*, Stephen Leach was convicted of possession of a controlled dangerous substance, phencyclindine (PCP). The evidence adduced at the bench trial was that PCP was recovered from the bedroom of an apartment occupied by Leach's brother, Michael Leach. Additionally, a "30-X magnifier and a large table scale" were found in plain view on a kitchen table and "[t]here was testimony that these items could be used in cutting and packaging drugs." 296 Md. at 594, 463 A.2d at 874. The trial judge had found that only Michael was the occupant, although later concluded that Stephen constructively possessed the drugs. We reversed and concluded that, "the fact finding that Michael was the occupant of the Premises precludes inferring that Stephen had joint dominion and control with Michael over the entire apartment and over everything contained anywhere in it." *Id.* at 596, 463 A.2d at 874. We reasoned that, "[e]ven though Stephen had ready access to the apartment, it cannot be reasonably inferred that he exercised restraining or directing influence over PCP in a closed container on the bedroom dresser or over paraphernalia in the bedroom closet." *Id.* We also found that Stephen's connection to the paraphernalia in the kitchen was insufficient to sustain his conviction for possession of paraphernalia: "If one assumes that the scales and magnifier found in plain view in the kitchen at the time of the search were always kept there, still those items are intrinsically innocuous. They become significant by association with drugs or cutting agents." *Id.*

17

The evidence adduced in the present case, conversely, demonstrated that both Gutierrez and Perez-Lazaro lived in the compact apartment. The gun, baggies, grinder and cocaine were variously found in the kitchen and bathroom and additionally, the hallway closet in which Gutierrez had personal papers. The testimony that the grinder and baggies were related to drug trafficking is relevant because Gutierrez and Perez-Lazaro were proven to be occupants of the apartment unlike Stephen Leach.

Gutierrez and Perez-Lazaro, nevertheless, also refer us to various out-of-state cases including *Edmond v. State*, 963 So.2d 344, 346 (Fla. Dist. Ct. App. 2007), *Smith v. State*, 279 So.2d 27 (Fla. 1973) and *Gee v. State*, 810 N.E.2d 338 (Ind. 2004), which they present as persuasive. In *Edmond*, Edmond was found in the utility room of a house within which the police located cocaine secreted in a sock and oven mitt during a search. 963 So.2d at 345. In a bedroom police found a driver's license bearing Edmond's name, but listing an address other than that of the residence being searched, a Sprint bill addressed to Edmond and cocaine that was not in plain view. *Id.* The evidence did not establish the location of the items within the bedroom. *Id.* The police also detained a female found in the house and another male who claimed to own the house. *Id.* The intermediate appellate court in Florida determined that the evidence was insufficient to establish constructive possession with respect to Edmond because there was no proof that Edmond lived there nor were the drugs or any drug related paraphernalia in plain view. *Id.* Certainly what was lacking in *Edmond*, occupancy, is not so in the present case.

In the other Florida case cited by Gutierrez and Perez-Lazaro, "investigating officers located illegal drugs along with women's costume jewelry in a dresser drawer in

18

the bedroom jointly occupied by defendant and his wife." *Smith*, 279 So. 2d 27, 28 (Fla. 1973). While the State argued that the husband's knowledge of the presence of the contraband could be inferred from his role as the "head of the household," the Florida Supreme Court disagreed. *Id.* The *Smith* case is clearly inapposite.

In *Gee*, police recovered drugs from within cabinets of a basement laundry room in a house that Gee leased, along with his cousin, and stayed in occasionally; Gee was convicted of possession. 810 N.E.2d at 340-42. Neither Gee nor his cousin was present when the drugs were seized from the laundry cabinets. *Id.* at 340. The Indiana Supreme Court reversed, reasoning that Gee was not present when the drugs were seized "and thus he was not found to be in actual possession of drugs." *Id.* at 340. The court opined that, "[w]hen a defendant's possession of the premises on which drugs are found is not exclusive, then the inference of intent to maintain dominion and control over the drugs 'must be supported by additional circumstances pointing to the defendant's knowledge of the nature of the controlled substances and their presence.'" *Id.* at 341 (internal citation omitted).

In that regard, the court reasoned that no evidence indicated that Gee frequented the basement laundry room and distinguished the case from *Carnes v. State*, 480 N.E.2d 581, 586 (Ind. Ct. App. 1985), in which a conviction based on constructive possession was upheld when drugs were found in a common area of a kitchen. *Gee*, 810 N.E.2d at 344. As the court noted, unlike a kitchen, where it is unlikely that a container of drugs would go unnoticed, a basement laundry room is less frequented. *Id.* at 344.

19

Contrary to Gutierrez and Perez-Lazaro's assertion, *Gee* does not contradict our holding because the bathroom and the kitchen, in which drugs were found in the instant case, are frequented by everyone in a household. Given the size of the apartment it could also be inferred that the hallway closet was shared and often frequented as well.

Because we hold that Gutierrez and Perez-Lazaro constructively possessed the CDS and gun, we also must address some of the prosecutor's commentary during rebuttal closing. Gutierrez and Perez-Lazaro both argue that the prosecutor's rebuttal closing was improper in three ways. First, Gutierrez and Perez-Lazaro assert the prosecutor improperly argued facts not in evidence by stating that, "No one in the few drug cases I've had, no cop has ever found drugs and the drugs come with the defendant's name on it." Second, they take issue with the prosecutor's comment that, "[Detectives] don't do routine fingerprints, they don't do routine DNA. This is a drug case. The State has budget concerns." Additionally, they argue that the State improperly shifted the burden and attacked the defense by commenting that "defense counsel has the same subpoena power as the State". Gutierrez and Perez-Lazaro also allege that "[e]ven if none of the improper comments, taken alone, would require reversal, their cumulative effect may prejudice the fact-finder in such a way as to deny the defendant a fair trial."[16]

We have previously explained that prosecutors are afforded "liberal freedom" when presenting closing argument:

---

[16] The State argues preservation before us because the defense only objected to one of the comments made by the prosecutor in rebuttal closing. The Court of Special Appeals, nevertheless, addressed the areas of concern suggested by Gutierrez and Perez-Lazaro, as shall we.

20

The prosecutor is allowed liberal freedom of speech and may make any comment that is warranted by the evidence or inferences reasonably drawn therefrom. In this regard, generally, . . . the prosecuting attorney is as free to comment legitimately and to speak fully, although harshly, on the accused's action and conduct if the evidence supports his comments, as is accused's counsel to comment on the nature of the evidence and the character of witnesses which the prosecution produces.

While arguments of counsel are required to be confined to the issues in the cases on trial, the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking, liberal freedom of speech should be allowed. There are no hard-and-fast limitations within which the argument of earnest counsel must be confined—no well-defined bounds beyond which the eloquence of an advocate shall not soar. He may discuss the facts proved or admitted in the pleadings, assess the conduct of the parties, and attack the credibility of witnesses. He may indulge in oratorical conceit or flourish and in illustrations and metaphorical allusions.

*Donaldson v. State*, 416 Md. 467, 488-89, 7 A.3d 84, 96 (2010).

The prosecutor is permitted to address issues raised by the defense. *Mitchell v. State*, 408 Md. 368, 389, 969 A.2d 989, 1002 (2009). In *Mitchell*, where the defense remarked in closing that there were other witnesses to a crime who may exculpate the defendant, we determined that the prosecutor's remark, in rebuttal, that "the defense has subpoena power just like the State does" was justified. *Id.*

Similarly, in *Degren v. State*, 352 Md. 400, 431, 722 A.2d 887, 902 (1999), where the defense counsel suggested in closing that the jury should not believe the State's witnesses because they had various motives to lie, the prosecutor argued in rebuttal that "nobody in this country has more reason to lie than a defendant in a criminal trial" and "this defendant has every reason to lie." We reasoned that the "trial court evidently determined that the prosecutor's comments were not improper" and "[g]iven the broad discretion afforded trial courts in making such determinations, we do not believe it

21

abused this discretion in denying petitioner's motions for mistrial and for a curative instruction." *Id.* at 431-32, 722 A.2d at 902.

In the present case, the trial court properly addressed the remarks made in rebuttal closing that the prosecutor had never seen a case where "drugs come with the defendant's name on it". Prior to the prosecutor's rebuttal closing, Perez-Lazaro's counsel spoke about DNA and fingerprinting evidence and stated that, "If you read the paper at least once a week, once a month, you'll see somebody who is found guilty on words is able to prove their innocence because of science and technology." In overruling the defense's objection to the State's comment, the trial court noted that defense counsel had talked about evidence in prior cases. Given the broad discretion afforded trial courts in making such determinations, we agree that the prosecutor's comments were a permissible response. *Degren*, 352 Md. at 432, 722 A.2d at 902.

The comments concerning DNA and fingerprinting not being "routine" were also a fair inference from the testimony given at trial. During the trial, Detective Swope testified that, "If I was in question as to where the gun came from or it belonged, then that's when I would have gotten it fingerprinted," and "[w]ith our DNA it's not common practice for a case like this to do the DNA". Based on this testimony presented, the State could argue that fingerprinting and DNA testing were not done in the present case, because it was not a common practice based on limited resources. *Mitchell*, 408 Md. at 383-84, 969 A.2d at 998-99, citing *Wise v. State*, 132 Md. App. 127, 146, 751 A.2d 24, 33 (2000).

The prosecutor also remarked during rebuttal closing that the defense has the same subpoena power as the State, which was a response to the defense arguing that there were absent witnesses. *Mitchell*, 408 Md. at 389, 969 A.2d at 1002. The defense's comments "opened the door" for the prosecutor to explain why other occupants were not present at trial. *Id.*

Accordingly, the Court of Special Appeals's judgment is hereby reversed.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. CASE REMANDED TO THAT COURT WITH INSTRUCTIONS TO AFFIRM THE JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY. RESPONDENTS TO PAY COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS.**

Circuit Court for Prince George's County, Maryland
Case No. CT 12-1276A  CT 12-1276B
Argued: November 9, 2015

IN THE COURT OF APPEALS
OF MARYLAND

No. 86
September Term, 2014

STATE OF MARYLAND

v.

HECTOR LEONEL GUTIERREZ &
EDGAR PEREZ-LAZARO

Barbera, C.J.
Battaglia
Greene
Adkins
McDonald
Watts
Harrell, Jr., Glenn T.
      (Retired, Specially Assigned),

JJ.

Dissenting Opinion by Greene, J. which
Adkins and McDonald, JJ., join.

Filed: January 28, 2016

I would affirm the judgment of the Court of Special Appeals and hold, as that court held, that the evidence offered to support the convictions of Gutierrez and Perez-Lazaro was legally insufficient. The intermediate appellate court concluded that the State failed either to establish ownership of the apartment occupied by Gutierrez and Perez-Lazaro at the time of the search or to place Gutierrez and Perez-Lazaro in "close proximity" to the contraband seized by the police.

According to Detective Dyson, of the Prince George's County Police Department, he and eight other police officers, pursuant to a search warrant, on August 9, 2012, entered an apartment located at 8018 14th Street in Hyattsville and observed two or three people inside, including Gutierrez and Perez-Lazaro. During the search for illegal drugs, Detective Dyson looked inside a cabinet under the bathroom sink and found six bags of powder cocaine. He explained on cross-examination that, "he did not see any drugs or paraphernalia in plain sight when he entered the apartment."

Detective Jeffrey Konya was also involved in the search. He confirmed that a grinder was found in the kitchen and cocaine in the hallway closet. He testified that in the hallway closet he found two passports that belonged to Gutierrez and a money wire receipt. He found, on the top shelf of the closet, cocaine wrapped in foil and under the bathroom sink, in a cabinet, he found more cocaine. This information was confirmed by Detective Dyson.

Detective Jason Swope, also involved in the search of the premises, essentially summarized the findings of the investigation. He testified that he entered the apartment after the SWAT team had secured the premises. He found both Gutierrez and Perez-Lazaro seated in the living room area. He confirmed that "he heard Gutierrez say that he slept in one of the beds in the living room, and Perez-Lazaro stayed in the back bedroom." According to Detective Swope, they found suspected "drug paraphernalia" and plastic zip-lock baggies in the living room area. He gave a summary of the items seized from the apartment: (a) plastic baggies of powder cocaine and a black handgun under the kitchen sink, (b) suspected paraphernalia on the kitchen window sill, (c) Gutierrez's "records" located on a shelf in the hallway closet, and separately, on the top shelf, were baggies of cocaine wrapped in foil, (d) a pay stub belonging to Perez-Lazaro in the back bedroom, and (e) two unidentified cell phones in the living room.

Finally, Officer Natalia Gaston, an expert in the field of distribution and packaging of controlled dangerous substances, testified that, in her opinion, considering the nature of the packaging and the presence of the weapon, the cocaine was possessed with the intent to distribute.

At trial, the State's theory of the case was that a rational jury could infer from the evidence that the two roommates had joint and constructive possession of the cocaine found in the common areas of the one-bedroom, one-bathroom apartment. Gutierrez and Perez-

2

Lazaro, however, disagree and contend that the evidence presented at their trial was insufficient to support a conviction for possession of either the contraband or gun found inside the apartment. They maintain that the gun and drugs offered into evidence were not in plain view, nor were they right in front of them or in close proximity to them. Moreover, they contend that the only items actually in plain view that were offered into evidence were "plastic baggies [found] on a cluttered table in the living room" and "a grinder in the kitchen," which are household items that could be found in many houses unconnected to the illicit drug trade. The State, however, referred to the items as "paraphernalia." No evidence was presented to establish Gutierrez's or Perez-Lazaro's ownership or possessory interest in the apartment where the cocaine was found.

In the present case, any finding that the respondents were in possession of drugs and a handgun was based on no more than speculation and conjecture. The evidence showed that the respondents were in the apartment at the time it was searched and that drugs were recovered from areas of the apartment that were not in plain view. No drugs were found in the back bedroom where Perez-Lazaro said he had slept. Likewise, no drugs were found in the living room where Gutierrez had slept. The State failed to produce any evidence to show "how long the respondents had been at the apartment prior to the search or what their connection was to the apartment." The grinder and baggies that were found in plain view are not contraband or otherwise illegal to possess. Clearly, in my view, the existence and

location of those items were insufficient to support a reasonable inference that Gutierrez or Perez-Lazaro exercised dominion and control over drugs and the handgun that were found secreted in the apartment.

From the evidence presented it is unknown how long Gutierrez and Perez-Lazaro occupied the premises, who or what gave them access to the apartment or what was the extent of their access to the premises. Had they occupied the apartment for a year, 30 days, one-night or one-hour before the search? Were they given full access or restricted access? Were they temporary visitors, overnight guests, or actually living at the address? When were the drugs placed at the premises? Who put them there? The current state of the law in Maryland does not require the prosecution to answer these questions definitively in its case-in-chief, but, without answers to these questions based on the evidence or reasonable inferences to be drawn from the evidence, the jury was left, in the present case, to speculate about ownership, the respondents' possessory interest in the apartment, their connection to the apartment and the drugs found secreted therein.

Proof that one of the men had slept in one of the beds in the living room and one man had slept in the bed located in the back bedroom did not prove that either Gutierrez or Perez-Lazaro possessed the cocaine "found underneath a bathroom sink and in a closed closet." The small bag of cocaine wrapped in foil that was located on the top shelf of the hallway closet was not removed from either Gutierrez's or Perez-Lazaro's exclusive or

4

joint possession. Similarly, the drugs found in the cabinet underneath the bathroom sink were not within the exclusive or joint possession of Gutierrez or Perez-Lazaro. If the drugs had been found in the living room or the back bedroom where the respondents had slept, respectively, perhaps a reasonable inference could have been drawn that each man was the sole occupant of his bedroom or sleeping area, and had constructive knowledge and control of drugs found in that room or specific area. *See Kamara v. State*, 205 Md. App. 607, 634, 45 A.3d 948, 963–64 (2012).

Knowledge is an essential element of the crime of possession of a controlled dangerous substance. *See Moye v. State*, 369 Md. 2, 14, 796 A.29 821, 828 (2002). The Court of Special Appeals, in *Folk v. State*, 11 Md. App. 508 (1971), pointed to the factors to be considered in determining whether an individual knowingly exercised dominion and control over contraband. After explaining that possession means to exercise actual or constructive control over a thing by one or more persons, the court outlined four factors to be considered in determining the knowledge required for possession:

  1) proximity between the defendant and the contraband,

  2) the fact that the contraband was within the view or otherwise within the knowledge
     of the defendant,

  3) ownership or some possessory right in the premises or the automobile in which the
     contraband is found, or

4) the presence of circumstances from which a reasonable inference could be drawn that the defendant was participating with others in the mutual use and enjoyment of the contraband.

*Folk*, 11 Md. App. at 516–17. *See also Smith v. State*, 415 Md. 174, 198, 999 A.2d 986, 999–1000 (2010).

> Absent sufficient evidence to establish the four factors, this case should not have been submitted to the jury. We have said:
>
> [A]n individual ordinarily would not be deemed to exercise "dominion or control" over an object about which he is unaware. Knowledge of the presence of an object is normally a prerequisite to exercising dominion and control.

*Dawkins v. State*, 313 Md. 638, 649, 547 A.2d 1041, 1046 (1988). The "[m]ere proximity to the drug, mere presence on the property where it is located, or mere association, without more, with the person who does control the drug or property on which it is found, is insufficient" to establish a reasonable inference that the respondents had knowledge of the contraband. *Taylor v. State*, 346 Md. 452, 460, 697 A.2d 462, 466 (1997) (citing *Murray v. United States*, 403 F.2d 694, 696 (9th Cir. 1968)). *See also Smith*, 415 Md. at 202–203, 999 A.2d at 1002–03 (Greene, J., dissenting).

6

In *Taylor*, when the police officers entered a motel room and other individuals were present, Mr. Taylor was lying on the floor, either asleep or pretending to be asleep. We pointed out that Mr. Taylor was not in exclusive possession of the premises, and that the contraband was secreted in a hidden place not otherwise shown to be within his control. As a result, we concluded that a rational inference could not be drawn that Taylor possessed the marijuana that had been smoked recently on the premises or that he was in close proximity to contraband that was concealed in a container belonging to another occupant. Not unlike the situation in *Taylor*, Gutierrez and Perez-Lazaro's mere proximity to the drugs and handgun that were secreted in the apartment, without more, is insufficient to support a finding that the occupants were in possession of the contraband.

Lastly, even though papers, belonging to the respondents were found inside the apartment, no reasonable jury could have inferred, without more, that the respondents had either sole or joint constructive possession of cocaine and the handgun discovered in the apartment under the circumstances. Mere presence in or on the property is not enough.

Accordingly, I respectfully dissent.

Judges Adkins and McDonald have authorized me to state that they join in this dissenting opinion.